## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00267-SBP

BRANDON JAMES BRADSHAW,

      Plaintiff,

v.

DESIRAE MEYER,
STEPHANIE ONTIVERAS,
BLESSED BARRACK,
MELISSA ROGERS, and
NEIL BOURJAILY,

      Defendants.

---

## MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS

---

**Susan Prose, United States Magistrate Judge**

      This court has before it two motions to dismiss: the Rule 12(b)(6) Motion to Dismiss filed by Defendants Desirae Meyer, Stephanie Ontiveras, and Neil Bourjaily (ECF No. 58), all of whom were or presently are medical providers employed by the Colorado Department of Corrections ("CDOC Defendants"), and Defendant Melissa Rogers' Motion to Dismiss Plaintiff's Amended Complaint [ECF 13] and Supplement to His Amended Complaint [ECF 44] Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 80).[1] The undersigned Magistrate Judge fully presides over this case pursuant to 28 U.S.C. § 636(c), the parties' consent (ECF No. 38), and the Order of Reference dated August 23, 2024 (ECF No. 40).

---

[1] The court will refer to the motions separately as the "CDOC Motion" and the "Rogers Motion" and collectively as the "Motions" or "Motions to Dismiss."

Having carefully reviewed the Motions and associated briefing and the applicable law, the court respectfully **ORDERS** that the CDOC Motion is **granted** as to the claims against Defendants Ontiveras and Meyer and **denied** with respect to the claim against Defendant Bourjaily. The Rogers Motion is **granted**.

## BACKGROUND

### I.    Facts

The following facts are drawn from the allegations in the amended complaint docketed at ECF No. 44, which, although entitled a "supplement," is in fact the operative pleading in this matter and will be referred to in this Order as the "Complaint" or "Amended Complaint."

Plaintiff Brandon J. Bradshaw, who is proceeding pro se, is incarcerated at the CDOC's Fremont Correctional Facility in Cañon City, Colorado ("Fremont" or "FCF"). ECF No. 44 at 2. The focus of this lawsuit is alleged deliberate indifference to his medical needs, which he contends was exhibited by the CDOC Defendants and Defendant Rogers, a medical provider who treated inmates at Fremont but who was not an employee of CDOC. Accordingly, the court focuses on the allegations against those providers.

### A.    Rogers' Tenure as Plaintiff's Provider at Fremont

The timeframe pertinent to Plaintiff's claims begins on May 1, 2020, when Rogers—a nurse practitioner who was "listed as" Plaintiff's "primary provider" at Fremont at that time, *id.* at 10, 17—enters the picture. Somehow, it came to Rogers' attention that Plaintiff was experiencing symptoms of some kind, prompting her to "initiate[] a Stroke Protocol" and ordering his transport to the emergency room at St. Thomas More Hospital in Cañon City. *Id.* at

10, 17. Plaintiff asserts that he had in fact suffered a "TIA," or "transient ischemic attack."[2] *Id.* at 10. Plaintiff arrived at the hospital at 9:21 a.m., and returned to Fremont sometime the same day. *Id.* Upon his return to the prison, Rogers, who "knew that the Plaintiff had been sent to the Hospital for a possible Stroke, . . . showed no interest and made no attempt to see the Plaintiff" again that day. *Id.* at 17.

Also on May 1, 2020, "the St. Thomas-More Emergency Room Medical Report" was transmitted to the prison and retrieved by an unidentified Fremont nursing staff member. *Id.*; *see also id.* at 17 (asserting that the May 1, 2020 report "was scanned by Nursing Staff into the Colorado Department of Corrections Information Computer System Medical Files (DCIS)"). In the report, according to Plaintiff, a physician at St. Thomas More "clearly outlines the findings of the complete occlusion of the left [internal carotid artery]." *Id.* at 10.[3] He asserts that Fremont medical staff made "no attempts after receiving this information, to refer the Plaintiff to a vascular specialist or vascular surgeon for evaluation," *id.*, but he does not allege that the report

---

[2] A "transient ischemic attack," also called a "ministroke," is "caused by a brief blockage of blood flow to the brain. A TIA usually lasts only a few minutes and doesn't cause long-term damage. However, TIA may be a warning. About 1 in 3 people who has a TIA will eventually have a stroke, with about half occurring within a year after the TIA." *See* Mayo Clinic, Transient ischemic attack (TIA), available at https://www.mayoclinic.org/diseases-conditiosn/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited September 25, 2025); *see also, e.g.*, *United States v. Woods*, No. 18-CR-00153 (JMB/HB), 2025 WL 706432, at *2 n.3 (D. Minn. Mar. 5, 2025) ("The Court takes judicial notice of the Mayo Clinic's description of gynecomastia under Federal Rule of Evidence 201(b)(2).") (citing *Giddings v. Cradduck*, 2017 WL 2791345, at *6 n.4, *7 n.5 (W.D. Ark. June 6, 2017) (taking judicial notice of information provided on the Mayo Clinic's and National Institute of Health's websites on dispositive motion involving prisoner's claim of receiving inadequate nutrition while in custody)).

[3] Certain capitalizations have been removed from the language quoted from the Complaint for ease of reading.

itself contained such a recommendation or suggested any other specific future treatment for him, including a particular medication regimen. *See id.*; *see also generally* ECF No. 44 (no allegations concerning other contents of the May 1, 2020 report of the emergency room visit).

### B.    Ontiveras' Tenure as Plaintiff's Provider at Fremont

On September 30, 2020, Plaintiff was "transferred" from Rogers to Defendant Ontiveras, another nurse practitioner, who assumed the role of his primary provider at Fremont at that time. *Id.* at 17. Plaintiff alleges that he personally saw Ontiveras one time—on September 30, the date of his transfer to her care—but there are no allegations explaining what prompted this encounter or the specific medical issue for which Plaintiff was seen on that date. Plaintiff does allege that Ontiveras "said nothing about the TIA or occluded arteries," *id.* at 10, but he does not allege that he brought up those topics. While Ontiveras was Plaintiff's primary provider for four months, *id.* at 10, or through approximately February 4, 2021,[4] *id.* at 18, there are no allegations that he ever saw Ontiveras again after September 30, 2020, or that Plaintiff ever asked to see her again.

Plaintiff does allege, however, that he received some specialty care during the period when he was under the "primary" care of Ontiveras. On October 6, 2020, he was transported to a cardiology practice in Pueblo, Colorado, where he was seen by Annie Dong, M.D. *Id.* at 10. At that time, Dr. Dong recommended that Plaintiff be seen by a neurologist for migraine headaches and that he receive thrombo-embolus deterrent, or "TED stockings[,] to prevent clots in his

---

[4] The Complaint lists this date as February 4, 2020, *see* ECF No. 44 at 18, an apparent typographical error.

legs." *Id.* at 11.[5] Someone at Fremont gave Plaintiff the TED stockings on December 1, 2020. *Id.*

    **C.**    **Bourjaily's Tenure as Plaintiff's Provider at Fremont**

    After Plaintiff left the care of Ontiveras on February 4, 2021, he was assigned to at least three other providers at Fremont before being transferred to Defendant Bourjaily, a physician assistant, on May 12, 2022. *Id.* at 18. Bourjaily was Plaintiff's primary provider for seven months, or until approximately December 2022. *Id.* at 19. Plaintiff saw Bourjaily for the first time on May 12, 2022—the purpose of that medical visit is not articulated in the Complaint—but at that time Bourjaily "said nothing about the TIA or Occluded Arteries." *Id.* at 11. Approximately two weeks later, on May 30, 2022, Plaintiff had a second TIA and was admitted to St. Thomas More. *Id.*

    While in the hospital, Plaintiff had a "US Carotid Duplex Bilateral Exam" and magnetic resonance imaging ("MRI") of his brain, which showed the "complete occlusion" of his left carotid artery and "less than 50% Occlusion" of his right carotid artery. *Id.* at 11-12. A physician at St. Thomas More told Plaintiff that the two TIAs he had experienced "may have been a result or contributing factor of the occluded arteries." *Id.* at 12. The physician "then stated that the Plaintiff was going to be discharged and could return to his facility with instructions." *Id.* What those "instructions" were are not alleged in the Complaint. *See id.*

    The next day, June 1, 2022, Plaintiff was back at Fremont, where he "was told" by

---

[5] Plaintiff apparently was seen by Dr. Dong, or another cardiologist, on other occasions not explicitly articulated in the Complaint. ECF No. 44-1 at 11 ("Numerous times the Cardiologist has stated in their reports that the Plaintiff needs Glucose Monitoring and Blood Pressure checks, which has fallen on deaf ears."). Plaintiff does not allege that Rogers or the CDOC Defendants failed to provide any follow-up care recommended by a cardiologist.

someone that Bourjaily "was taking him off" aspirin—he apparently had been placed on an aspirin regimen, by Bourjaily or another provider, at some previous point—and "was being started on" a medication called Plavix. *Id.* The court takes judicial notice of the fact that Plavix, the brand name for clopidogrel bisulfate, is a "platelet inhibitor indicated for acute coronary syndrome" and "recent MI [myocardial infarction], recent stroke, or established peripheral arterial disease, that "has been shown to reduce the rate of MI and stroke." *See* Plavix, Prescribing Information, Physicians' Desk Reference, available at pdr.net (last visited September 27, 2025); *see also Purkey v. Green*, 28 F. App'x 736, 742 n.4 (10th Cir. 2001) (taking judicial notice of the properties of a prescription medication from the Physicians' Desk Reference); Fed. R. Evid. 803(18)(B) (statements contained in a treatise, established as a reliable authority by the testimony of an expert witness or judicial notice, are admissible under the learned treatises hearsay exception).

On June 22, 2022, as reflected in a response to a grievance from Plaintiff written by Defendant Meyer,[6] Plaintiff was seen by his medical provider at Fremont—presumably Bourjaily, his then-primary provider. ECF No. 44 at 12. At that time, "a treatment plan was discussed[.]" *Id.* The plan was to refer Plaintiff "to cardiology" based on the "occlusion of [his] carotid arteries and no acute intra-cranial findings" on his MRI. *Id.* Plaintiff disagreed that a referral to a cardiologist was the correct course of care for him; rather, he asserts, "this issue falls under the specialty of a vascular specialist or surgeon not a cardiologist or neurologist." *Id.*

On August 25, 2022, two months after Plaintiff's and Bourjaily's discussion concerning a

---

[6] According to the Complaint, Meyers' only contact with Plaintiff was responding to this grievance.

treatment plan, Plaintiff was notified that he was scheduled for surgery on his left shoulder to repair an injury that he sustained at the time of the first TIA. *Id.* at 13. Before the surgery, Plaintiff asked Bourjaily if his occluded arteries could cause complications during surgery, and Bourjaily responded "that there was no risk of any complications occurring during surgery and it was safe to have the surgery." *Id.* Turns out, "Mr. Neil Broujaily was wrong!"—per the physicians slated to perform the surgery. *Id.*

When Plaintiff arrived at St. Thomas More for the surgery on September 1, 2022, it came up during "idle conversation" with a nurse that Plaintiff had arterial occlusions. *Id.* The nurse, along with the surgeon and anesthesiologist, claimed surprise and lack of awareness concerning the existence of the occlusions, notwithstanding that condition having been diagnosed at St. Thomas More by means of medical imaging conducted at that facility. *Id.* at 13-14. But when the fact of the occlusions came to light, the physician and anesthesiologist refused to perform the surgery and asserted that they would not operate until the "arteries were cleared." *Id.* at 14. Plaintiff returned to Fremont without having the surgery.[7]

On September 21, 2022, three weeks after the cancellation of the surgery, Dr. Garcia, a cardiologist from whom Plaintiff was receiving care, submitted a report to "FCF Medical." *Id.* at 14. Plaintiff alleges that the report contained the following information:

FCF Medical is repeatedly attempting to get the Cardiologist, Dr. Garcia to approve

---

[7] It is difficult to understand, based on the current record, why Fremont personnel scheduled Plaintiff for shoulder surgery again on June 6, 2023, without having addressed the concerns raised by the surgeon and anesthesiologist in September 2022—prompting yet another cancellation. *See* ECF No. 44 at 14 ("On June 6, 2023, the Plaintiff was again transported to St. Thomas-More for shoulder surgery, and again since the arteries had not been cleared the surgery could not be performed."). However, this conundrum need not be addressed in connection with the instant Motions to Dismiss.

> the surgery, but he stated in his reports dated September 21, 2022 and October 31, 2023 that in fact the areas relating to the carotid arteries were not his specialty and that the Plaintiff was to be referred to a vascular surgeon or specialist. This was stated in both of his reports received by FCF Medical. Dr. Garcia further stated that the Plavix would not have any benefit on reducing the occlusions, it was used such that if any clots broke off, and if they were small enough, the Plavix would hopefully dissolve them before they reached any vital organs.

*Id.* Plaintiff was not seen by a vascular specialist at any point during the remainder of Bourjaily's assignment as Plaintiff's primary provider, through December 2022.

## II.    Plaintiff's Claims

Plaintiff filed this lawsuit on January 26, 2024. He sues Rogers and the CDOC Defendants in their individual capacities for monetary damages pursuant to 42 U.S.C. § 1983, seeking a total of $750,000 from each of them. ECF No. 44 at 6. Although the Complaint lists two claims, both rest on the same theory: deliberate indifference to serious medical needs in violation of the Eighth Amendment. *See id.* at 4 (styling Claim One as a "Violation of US. const. Amend. VIII, Cruel and Unusual punishment – Failure to Provide Competent Medical Care"); *id.* at 16 (styling Claim Two as a "Violation of U.S. Const. Amend. VII, Cruel and Unusual Punishment – Deliberate Indifferent to Serious Medical Needs").

The court therefore analyzes the claims as they are pleaded—functionally, as a single cause of action—and, for the reasons that follow, respectfully finds the claims against Defendants Ontiveras, Meyer, and Rogers must be dismissed. The claim against Bourjaily, however, survives scrutiny under the relevant standards.

## ANALYSIS

## I.    CDOC Motion

Each CDOC Defendant seeks dismissal of the claims against them on multiple grounds,

including that they are entitled to qualified immunity. ECF No. 58 at 14-15. Because Defendants

have invoked qualified immunity, the court must rule on the merits of that defense. *See, e.g.*,

*Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) ("[W]e repeatedly have stressed the

importance of resolving immunity questions at the earliest possible stage in litigation."; *Weise v.

Casper*, 507 F.3d 1260, 1265 (10th Cir. 2007) (recognizing that "a district court cannot avoid

ruling on the merits of a qualified immunity defense when it can resolve the purely legal question

of whether a defendant's conduct, as alleged by plaintiff, violates clearly established law");

*Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 466 (6th Cir. 2023) (recognizing that "when a

defendant moves to dismiss on qualified-immunity grounds, district courts cannot 'avoid ruling

on the issue'") (quoting *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004)); *Woodson v. Armor

Corr. Health Servs., Inc.*, No. 20-cv-00186-RM-KMT, 2020 WL 4041460, at *3 (D. Colo. July

17, 2020) ("The Tenth Circuit has made clear that 'qualified immunity questions should be

resolved at the earliest possible stage in litigation.'") (quoting *Schwartz v. Booker*, 702 F.3d 573,

579 (10th Cir. 2012), quoting *Hunter*, 502 U.S. at 227); *cf. Siegert v. Gilley*, 500 U.S. 226, 231

(1991) ("Until this threshold [qualified] immunity question is resolved, discovery should not be

allowed.").[8]

---

[8] Plaintiff's contention that qualified immunity is inapplicable here, *see* ECF No. 69 at 15-16, is
incorrect. The docket plainly demonstrates that the CDOC Defendants are in fact current or
former CDOC employees. *See* ECF No. 18 (waiver of service stating that Ontiveras and
Bourjaily "are no longer DOC employees" and waiving service for Meyer, a current CDOC
employee ). And to the extent Plaintiff suggests that some state law overrides federal qualified
immunity, there is no legal support for that assertion; indeed, the very case he cites belies it. *See*
ECF No. 69 (citing *Martinez v. Est. of Bleck*, 379 P.3d 315, 322 n.5 (Colo. 2016)). Far from
holding that defendants in a federal lawsuit are prohibited from raising the long-entrenched
defense of qualified immunity to § 1983 claims based on some concept of state-law preemption,

The court therefore addresses the qualified-immunity question at the outset and finds that Plaintiff has failed to carry his burden to overcome that defense as to Defendants Ontiveras and Meyer. The court explains this conclusion by first laying out the operative legal framework, then delineating the reasons why Plaintiff's pleading falters on the subjective prong, and, finally, highlighting the absence of any law of sufficient specificity to clearly establish that a constitutional violation occurred under the particular circumstances alleged here. As to Defendant Bourjaily, however, Plaintiff has carried his burden at this stage, and the defense is denied.

A.      **Legal Standards**

1.      **Federal Rule of Civil Procedure 12(b)(6)**

Pursuant to this Rule, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), a court must "'accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff.'" *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

the Colorado Supreme Court in *Martinez* referenced "the well-recognized federal qualified immunity defense" that applies to a plaintiff's "federal claims." *Id.* at 322 n.5 (noting language in the trial court's opinion adopting the language of the federal qualified immunity defense in describing a defense under the Colorado Governmental Immunity Act). This court is aware of no other authority supporting that unusual proposition.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

In conducting the plausibility analysis, the court acknowledges Plaintiff's status as a pro se litigant and bears in mind that pro se filings are entitled to liberal construction. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam). Even so, the court cannot and does not act as a pro se litigant's advocate, *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), and applies the same procedural rules and substantive law to a pro se party as to one who is represented. *Murray v. City of Tahlequah*, 312 F.3d 1196, 1199 n.3 (10th Cir. 2002); *Dodson v. Bd. of Cnty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012).

### 2.    Deliberate Indifference to Serious Medical Needs

The Eighth Amendment to the United States Constitution guarantees a prisoner's right to "humane conditions of confinement guided by 'contemporary standards of decency.'" *Penrod v.*

*Zavaras*, 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials are required to "ensur[e] inmates receive the necessities of adequate food, clothing, shelter, and medical care[.]" *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998).

Prison officials violate the Eighth Amendment when they are deliberately indifferent to an inmate's serious medical needs. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). As the Tenth Circuit has emphasized, two types of conduct constitute deliberate indifference to a prisoner's medical need. *Id.* at 1211. "First, a medical professional may fail to treat a serious medical condition properly." *Id.* "Where this sort of conduct is alleged, the medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* Second, a prison official may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* A medical professional is generally not liable for this second type of violation unless that professional's role "in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and [ ] he delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Id.*

Like other claims under the Eighth Amendment, a claim for deliberate indifference involves both an objective and a subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Under the objective component, a prisoner must plausibly allege that "the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention." *Id.* at 751 (even a physician's grossly negligent medical judgment does not violate the Constitution if the need for medical treatment was not obvious) (internal quotations and citation omitted). Furthermore, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan,* 241 F.3d 1272, 1276 (10th Cir. 2001) (quotations and citation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) (citation omitted). Here, for purposes of the Motion to Dismiss, the CDOC Defendants do not dispute that Plaintiff's occluded arteries satisfy the objective prong of the analysis. *See* ECF No. 58 at 9.

The subjective component of a deliberate indifference claim recognizes that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997); *see also Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). That component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). Mere negligence is not sufficient to meet this standard. *Farmer*, 511 U.S. at 835. Rather, "[t]he subjective component is akin to 'recklessness in the criminal law,' where, to act recklessly, a 'person must 'consciously disregard' a substantial risk of serious harm.'" *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 839). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Mata*, 427 F.3d at 751) (quoting *Farmer*, 511 U.S. at 837); *see also id.* at 753 ("The question is: were

13

the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?").

"[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). Neither is the subjective prong met when a medical professional "merely exercises his considered medical judgment," such as deciding whether to consult a specialist or to prescribe one type of medication instead of another. *Self*, 439 F.3d at 1232-33; *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992) ("Plaintiff's belief that he needed additional medication, other than that prescribed by the treating physician, as well as his contention that he was denied treatment by a specialist is, as the district court correctly recognized, insufficient to establish a constitutional violation.") (citing *Estelle*, 429 U.S. at 107 ("matter[s] of medical judgment" do not give rise to § 1983 claim); *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation)).

In addition to the two-part inquiry for deliberate indifference claims, "[p]ersonal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic*, 545 F.2d, 1260, 1262-63 (10th Cir. 1976); *see also Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) ("§ 1983 imposes liability for a defendant's own actions—personal participation in the specific constitutional violation complained of is essential.") (citing *Foote*, 118 F.3d at 1423-24) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.") (citation omitted)); *Trujillo v. Williams*, 465 F.3d 1210, 1228 (10th Cir. 2006) ("In order for liability to arise under § 1983, a defendant's *direct personal*

*responsibility* for the claimed deprivation . . . must be established.") (emphasis added).

### 3.    Qualified Immunity

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation marks omitted)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (under the doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights[.]'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins*, 519 F.3d at 1249).

To overcome the defense, "the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Surat v. Klamser*, 52 F.4th 1261, 1270-71 (10th Cir. 2022) (quotations omitted); *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (same). The court has "discretion to decide the order in which to engage the two prongs of the qualified immunity standard." *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (cleaned up). Regardless of the order, "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense." *A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016); *see also Andersen*, 79 F.4th at 1163 (if the court "conclude[s]

that the plaintiff has not met his burden as to either part of the two-prong inquiry, [the court] *must grant qualified immunity* to the defendant") (citing *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (emphasis added)). Stated in a slightly different way, "'[t]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877-78 (10th Cir. 2014) (quoting *Medina*, 252 F.3d at 1128).

In considering the first prong of the qualified immunity analysis, whether the official has violated a constitutional right, the court assesses whether the well-pleaded facts plausibly show that the defendant personally participated in the alleged constitutional violation. *See Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) ("[A]lthough the requirement of personal participation, including the question of supervisory liability, is a component of liability under § 1983 and *Bivens,* we also incorporate it into our qualified-immunity analysis, where we ask whether a clearly established constitutional right has been violated.") (citing *Dodds v. Richardson*, 614 F.3d 1185, 1193-94 (10th Cir. 2010)); *see also Vreeland v. Polis*, No. 20-cv-02420-PAB-SKC, 2023 WL 6160693, at *6, 8 (D. Colo. Sept. 21, 2023) (considering personal participation "under the first prong of qualified immunity," and finding a defendant "entitled to qualified immunity . . . based on plaintiff's failure to allege any facts in support of [the defendant's] participation in the deprivation of plaintiff's constitutional rights").

As for the clearly established law prong, an official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up) (emphasis added). "Put simply,

qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Pahls*, 718 F.3d at 1227 (qualified immunity, "by design, 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions'") (quoting *al-Kidd*, 563 U.S. at 743).

For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision "on point," or the "clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (quotation omitted). "The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). While a plaintiff is not required to cite a case with "identical facts" to demonstrate a clearly established right, *Kapinski v. City of Albuquerque*, 964 F.3d 900, 910 (10th Cir. 2020), clearly established law must place the constitutional issue "'beyond debate.'" *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 741). It is the plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law.").

### B.    Application

After careful review of the well-pleaded allegations, the court concludes that Plaintiff has not carried his two-part burden to overcome qualified immunity as to Ontiveras and Meyer. As to

Ontiveras, the Complaint does not plausibly allege the requisite subjective state of mind, and Plaintiff identifies no Tenth Circuit (or other) authority clearly establishing a constitutional violation on the facts alleged; the court has located none. As to Meyer, the claim fails at the threshold for lack of any allegation of her personal participation in the asserted constitutional deprivation. By contrast, as to Bourjaily, the Complaint plausibly alleges the subjective component—based on the post-cancellation inaction alleged—and invokes authority sufficient, at this stage, to defeat the clearly-established prong.

### 1.    Claim Against Ontiveras

Having scrutinized the pertinent allegations in detail, the court determines that Plaintiff has not satisfied his heavy two-part burden to overcome Ontiveras' invocation of qualified immunity. Regardless, the claim against Ontiveras is time-barred.

***No constitutional violation.*** To begin, the court finds that Plaintiff's allegations concerning Ontiveras cannot demonstrate the subjective component of deliberate indifference so as to overcome her assertion of qualified immunity.

The Complaint exhibits fatal shortcomings with respect to Ontiveras and the subjective intent prong of the deliberate indifference inquiry. Affording Plaintiff's allegations full credit, as the court is obliged to do, the heart of his claim against Ontiveras seems to be that she failed to implement directives or recommendations from the providers at St. Thomas More who diagnosed him with a TIA and an occluded left carotid artery on May 1, 2020. The trouble with this theory, on a fundamental level, is that Plaintiff fails to allege that there in fact were any recommendations or directives for follow-up care contained in the hospital report that was transmitted to Fremont. *See generally* ECF No. 44 (no allegations concerning such content in the

18

St. Thomas More report). The pleading is notably silent on these points, which are factual "details [Plaintiff] should know and could properly plead"—he clearly has the report in hand and describes some of its contents, *see id.* at 10 —but has not alleged. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (finding inadequate pleading rendered claims implausible and affirming dismissal). But even if Plaintiff had alleged the existence of specific recommendations in the May 1, 2020 report, the fact of such recommendations would not plausibly indicate culpable mental intent in Ontiveras' choices concerning the care she provided or facilitated for Plaintiff (including the examination by a cardiologist on October 6, 2020).

First, no allegations plausibly suggest that Ontiveras—a medical provider working in a prison housing hundreds of inmates[9]—in fact reviewed that report and acquired actual knowledge of its contents. Neither does Plaintiff allege that *he* brought up that he had been hospitalized on May 1, 2020, during his one-time encounter with Ontiveras. "Deliberate indifference requires *actual knowledge* of substantial risks to the prisoner, so '[n]either negligence nor constructive notice satisfy' this standard." *Hall v. Shumard*, No. 15-cv-01949-RBJ-MJW, 2017 WL 694589, at *4 (D. Colo. Feb. 21, 2017) (quoting *Robinson v. Carr*, 99 F.3d 1150, at *4 (10th Cir. 1996) (unpublished) (citing *Farmer*, 511 U.S. at 840-42) (emphasis added)); *see also, e.g.*, *Lazos v. Harvey Cnty. Bd. of Comm'rs*, No. 24-3016-JWL, 2024 WL 3043155, at *6 (D. Kan. June 18, 2024) (observing that "[t]he Supreme Court has insisted upon

---

[9] Fremont currently houses over 1,500 inmates. Statistics | Colorado Department of Corrections (last visited September 28, 2025); *see also Doe v. Heil*, 533 F. App'x 831, 833 n.22 (10th Cir. 2013) (taking judicial notice of fact obtained from CDOC's website) (citing *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.2 (10th Cir. 2009)); *Firth v. Raemisch*, No. 16-cv-00406-LTB-GPG, 2016 WL 8999474, at *2 n.1 (D. Colo. Aug. 22, 2016) ("The Court may take judicial notice of the contents of the CDOC's Offender Search website.").

actual knowledge" when it comes to the subjective prong of the deliberate indifference test). Put another way, "constructive notice" is not the standard for deliberate indifference and "is plainly insufficient." *See Yapoujian v. Doe*, No. 23-cv-02703-NYW-NRN, 2024 WL 4805185, at *3 (D. Colo. Aug. 29, 2024), *report and recommendation adopted*, 2024 WL 4803100 (D. Colo. Nov. 15, 2024).[10]

Second, even if Ontiveras somehow fell short in not apprising herself of the St. Thomas More report that *might* have contained a recommendation, that omission clearly falls within the realm of medical negligence, not deliberate indifference. It has long been established that "[d]eliberate indifference requires more than a showing of negligence or even malpractice." *Vasquez v. Davis*, 882 F.3d 1270, 1278 (10th Cir. 2018) (cleaned up) (citing *Farmer*, 511 U.S. at 835; *Self*, 439 F.3d at 1230-33); *see also, e.g.*, *Perkins*, 165 F.3d at 811 ("A negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.") (citing *Estelle*, 429 U.S. at 105-06); *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997) ("medical malpractice does not constitute deliberate indifference") (citing

---

[10] *See also, e.g.*, *Williams v. Guzman*, 346 F. App'x 102, 105 (7th Cir. 2009) ("With no evidence that the doctors knew about the note and deliberately disregarded it, failure to review the nurse's note is at most negligence, which is insufficient to establish deliberate indifference.") (citing *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (explaining that guard's negligent failure to review jail logbooks would not constitute deliberate indifference); *Stewart v. Murphy,* 174 F.3d 530, 536 (5th Cir. 1999) (in certain circumstances, doctor's failure to read nurse's notes might constitute negligence but not necessarily deliberate indifference)); *Brandon v. Dep't of Corr.*, No. 3:21-CV-5417-JCC-DWC, 2021 WL 5967951, at *2 (W.D. Wash. Oct. 29, 2021), *report and recommendation adopted*, 2021 WL 5937685 (W.D. Wash. Dec. 16, 2021) ("Plaintiff provides conclusory allegations that 'Defendants' failed to follow orders contained in his medical chart. However, Plaintiff has provided no allegations showing Defendants were aware of the orders and acted with deliberate indifference to those medical orders.")

*Estelle*, 429 U.S. at 106).

During Ontiveras' tenure as primary care provider for Plaintiff, he had experienced one "mini-stroke," and it is evident from the allegations in the Complaint that Plaintiff was receiving outside specialty care from a cardiologist. Indeed, just a week after Plaintiff's only visit with Ontiveras, on October 6, 2020, he was seen by Dr. Dong, a cardiologist. ECF No. 44 at 18. Although a cardiologist was not the specialist Plaintiff preferred—he sought treatment from a vascular surgeon, *id.* at 12—Ontiveras' decision to refer him to a cardiologist, under the circumstances then prevailing, does not evince that she perceived a substantial risk of harm to Plaintiff and proceeded with conscious disregard thereof, exhibiting the culpable, criminally reckless state of mind required. *See Farmer*, 511 U.S. at 837.

In sum, even crediting all well-pleaded facts and drawing reasonable inferences in Plaintiff's favor, the allegations concerning Ontiveras do not support a plausible inference that she acted with the "sufficiently culpable state of mind" required to satisfy the subjective component of deliberate indifference. Because the Complaint thus fails to allege a constitutional violation by Ontiveras, she is entitled to qualified immunity. *See Holmes*, 830 F.3d at 1134-35 (explaining that "if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense").

***No clearly established law.*** Additionally, no clearly established law confirmed that Ontiveras' actions were unconstitutional.

Plaintiff has adduced no Tenth Circuit or Supreme Court precedent, or a clear weight of authority from other courts, clearly establishing that a prison medical provider—here, a nurse practitioner—violates the Eighth Amendment when she does not act to ensure that an inmate

with a history of one TIA is sent to a vascular specialist, particularly when the inmate is already

receiving specialized care from a cardiologist. Nor has this court located such a case. Likewise,

the court has located no law that would have made it clear to every reasonable official in

Ontiveras' position, beyond debate, that she would commit an infraction of constitutional

magnitude by failing to implement a recommendation in an emergency department note of which

she was unaware. *See, e.g.*, *Brown v. Prison Health Servs.*, 159 F. App'x 840, 841 (10th Cir.

2005) (upholding the dismissal of a deliberate indifference claim where the inmate alleged that a

provider, contrary to information contained in his medical file, administered a contraindicated

medication to him: "the district court concluded that [the plaintiff's] claims failed because there

was absolutely no indication that prison officials knowingly placed Brown on the improper

diabetes medication," which "reflected at most a state tort claim of negligence or malpractice");

*Burns v. Huss*, No. 10-cv-02691-WJM-CBS, 2013 WL 2295422, at *11 (D. Colo. May 24, 2013)

(holding that a prison medical provider's failure to check an inmate's medical history charts or

records before prescribing a medication was not an action amounting to deliberate indifference:

"As a matter of law, a medical professional's failure to check on inmate's medical file for allergy

information does not state an Eighth Amendment claim.") (citing *Brown*, 159 F. App'x at 841;

*Holloman v. Nelson,* 817 F. Supp. 88, 90 (D. Kan. 1993) (dismissing Eighth Amendment claim

arising from alleged failure to maintain accurate medical records and to closely monitor

medication allergies); *Erickson v. Newberry*, No. 07-cv-00618-WDM-BNB, 2008 WL 2690719,

at *4 (D. Colo. July 3, 2008) (adopting recommendation to dismiss Eighth Amendment claim

against prison official who administered codeine without reviewing the plaintiff's medical chart

for allergy warnings)).

Having failed to identify any precedent with the requisite particularity so as to render the law clearly established, Plaintiff has likewise failed to satisfy his burden on the clearly established law prong. Ontiveras is thus entitled to qualified immunity on this independent ground as well. The deliberate indifference claim against her is therefore **dismissed with prejudice**.[11]

*Failure to timely raise the claim.* Even assuming that Ontiveras were not entitled to qualified immunity, the claim against her could not proceed, as it is barred by the applicable statute of limitations

Ontiveras argues that the Eighth Amendment claim against her is "clearly untimely." ECF No. 58 at 7. The well-pleaded facts support that contention. To ensure a complete evaluation of the grounds for dismissing the claim against Ontiveras, the court explains why.

"A statute of limitations defense may be appropriately resolved on a [Rule] 12(b) motion when the dates given in the complaint make clear that the right sued upon has been extinguished." *Sierra Club v. Okla. Gas & Elec. Co.*, 816 F.3d 666, 671 (10th Cir. 2016) (internal quotation marks omitted). "If from the complaint, 'the dates on which the pertinent acts

---

[11] Dismissal of a claim on qualified immunity grounds may be with prejudice. *See, e.g.*, *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (instructing district court to dismiss based on qualified immunity "with prejudice"); *Lybrook v. Members of the Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1341-42 (10th Cir. 2000) (affirming district court order granting motion to dismiss with prejudice on qualified immunity grounds); *Vreeland v. Olson*, No. 20-cv-02330-PAB-SKC, 2021 WL 4237269, at *5 n.7 (D. Colo. Sept. 16, 2021) ("The Court will dismiss the claim against Olson and Reed [brought by a pro se plaintiff] with prejudice because they are entitled to qualified immunity."). Perceiving no viable means by which Plaintiff could cure the deficiencies in his claim against Ontiveras through amendment—including, but not limited to, its time-barred nature—the court concludes that dismissal with prejudice is warranted here.

occurred are not in dispute, [then] the date a statute of limitations accrues is . . . a question of law' suitable for resolution at the motion to dismiss stage." *Herrera v. City of Espanola*, 32 F.4th 980, 990 (10th Cir. 2022) (quoting *Edwards v. Int'l Union, United Plant Guard Workers of Am.*, 46 F.3d 1047, 1050 (10th Cir. 1995); citing *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018) (stating that a court may grant a motion to dismiss based on a statute of limitations defense only "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements")). "The forum state's statute of limitations for personal-injury actions sets the limitations period for § 1983 actions," *Gee v. Pacheco*, 627 F.3d 1178, 1190-91 (10th Cir. 2010), which, in Colorado, is two years. Colo. Rev. Stat. § 13-80-102(1)(a) (general limitation for personal injury claims is two years from when the action accrues). "Federal law, on the other hand, governs when a § 1983 claim accrues and when the limitations period begins to run." *Ullery v. Bradley*, 949 F.3d 1282, 1288 (10th Cir. 2020) (citing *Kripp v. Luton*, 466 F.3d 1171, 1175 (10th Cir. 2006)). A civil rights action accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Herrera*, 32 F.4th at 990 (quotation omitted).

Here, all of Plaintiff's claims—including the claim against Ontiveras—are directly related to his occluded arteries, for which he was sent to a hospital for emergency evaluation on May 1, 2020. ECF No. 44 at 10, 17. At that point, he knew, or had reason to know, of the arterial occlusions that are the basis of this action. His assertion, suggested in his pleading, that he somehow lacked knowledge of his fully-occluded left carotid artery until the second TIA in May 2022, cannot plausibly be countenanced. His situation on May 1, 2020, was of such severity as to warrant a trip to the hospital for evaluation. And the implication that Plaintiff—who has

repeatedly and ably explained his position in the filings he has made in this case—could not have obtained copies of his medical records himself (including his records from St. Thomas More) strains credulity. Thus, Plaintiff entered his patient-caregiver relationship with Ontiveras on September 30, 2020, with the ability to know (assuming, for purposes of argument, that he lacked actual knowledge) of the injury that is the basis for this action.[12]

At the latest, then, the two-year statute of limitations for Plaintiff's claim against Ontiveras began to run on the last day on which she functioned as his caregiver: February 4, 2021. The filing of this lawsuit on January 26, 2024, means that Plaintiff's claim against Ontiveras is untimely by nearly one full year. The claim against her is thus subject to **dismissal with prejudice** for this additional reason. *See, e.g.*, *Gee*, 627 F.3d at 1195 (affirming dismissal with prejudice of claims barred by the applicable statute of limitations).

### 2. Claim Against Bourjaily

The claim against Bourjaily arises in a materially different factual context than the claim against Ontiveras. The court commences its analysis by reiterating the well-pleaded facts:

- Bourjaily served as Plaintiff's primary provider from May 12, 2022, through the end of December 2022, ECF No. 44 at 18-19;

- Bourjaily saw Plaintiff for the first time on May 12, 2022, for reasons that are not specified in the Complaint; *id.* at 11;

- Two weeks later, on May 30, 2022, Plaintiff experienced a second TIA and was admitted to St. Thomas More; *id.*;

---

[12] This conclusion is bolstered by Plaintiff's argument in his response to the CDOC Motion to Dismiss, in which he asserts that he was told by St. Thomas More medical personnel to ask his CDOC providers about his condition. *See* ECF No. 69 at 10. While he claims that he submitted "kites" to get this information, *id.*, he does *not* assert that he posed the question directly to Ontiveras, including when he saw her for an in-person medical visit on September 30, 2020.

- Plaintiff underwent testing at St. Thomas More which revealed a "complete occlusion" of his left carotid artery and an occlusion (described as "less than 50%") of his right carotid artery; *id.* at 11-12;

- Plaintiff was released from St. Thomas More with unspecified "instructions," *id.* at 12, but the day after his release from the hospital, Bourjaily changed Plaintiff from an aspirin regimen to the medication Plavix, a drug that has been shown to reduce the rate of stroke, *id.* at 12;

- On June 22, 2022, Bourjaily discussed a treatment plan with Plaintiff that included a referral "to cardiology," *id.*;

- On August 25, 2022, Plaintiff was notified he was scheduled for shoulder surgery, prompting him to ask Bourjaily if his occluded arteries could cause complications during surgery, *id.* at 13;

- Bourjaily voiced the opinion that the occlusions would not prevent the surgery from going forward, but the assigned surgeon and anesthesiologist refused to perform the surgery on September 1, 2022, stating that they would not operate on Plaintiff until his "arteries were cleared," and sent him back to Fremont, *id.* at 13-14;

- On September 21, 2022, a cardiologist who was providing care to Plaintiff issued a report stating that "carotid arteries were not his specialty" and that Plaintiff should be referred to "a vascular surgeon or specialist," *id.* at 14; and

- Also in the September 21, 2022 report, the cardiologist stated that Plavix does not reduce existing occlusions, but would only "hopefully dissolve them" if any "broke off . . . before they reached any vital organs." *Id.*

Assuming these facts to be true and affording them maximum credit, the factual scenario with which Bourjaily was confronted during the period he served as Plaintiff's primary caregiver plausibly supports an inference that he acted with subjectively culpable intent in his decision-making.

At the outset, the well-pleaded facts are at odds with Bourjaily's characterization of the claim against him as resting merely on his statement "that the occluded arteries would not be an increased risk when getting shoulder surgery" and his prescribing Plaintiff "the wrong

medication (Plavix)." ECF No. 58 at 12. To be sure, Bourjaily cannot be held liable under the Eighth Amendment for mistakes, even ones so egregious as to constitute malpractice. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The court agrees that no plausible inference of subjectively culpable intent arises from Bourjaily's pre-surgical misunderstanding as to whether the procedure could safely proceed, or from any error he may have committed in prescribing a particular medication to Plaintiff.[13]

Regardless, Plaintiff's deliberate indifference claim against Bourjaily rests on more than these two discrete errors. Its gravamen is that, once it became apparent on September 1, 2022, that there were blockages in both of Plaintiff's carotid arteries—the left fully occluded at one hundred percent, and the right occluded by less than fifty percent—were so severe that the assigned surgeon and anesthesiologist aborted the scheduled shoulder surgery mere moments before it was to commence, even though Plaintiff had already begun pre-surgical preparations, Bourjaily failed to take action to procure medically necessary treatment for Plaintiff. ECF No. 44 at 13 (alleging that Plaintiff conversed with the "attending nurse" before the surgery). Due to the occluded arteries, neither the surgeon nor the anesthesiologist (nor, apparently, St. Thomas More Hospital itself) was willing to assume the "increased risk of stroke, heart attack or even death during the surgical procedure[.]" *Id*. at 14. Plaintiff was thus returned to the correctional facility—undoubtedly at considerable expense to the hospital, which had allocated an operating

---

[13] The court does not read the Complaint to assert that Plavix was the wrong medication for Plaintiff, but rather that Bourjaily should have immediately commenced prescribing it when he assumed the role of Plaintiff's primary care provider approximately two weeks before Plaintiff suffered the second TIA on May 31, 2022. ECF No. 44 at 18-19.

room and the time of two physicians for a procedure that all parties had fully anticipated would proceed.

These inferences are reasonably derived from the well-pleaded facts, including the inference that Bourjaily, as Plaintiff's primary medical provider at the prison, was made aware that the surgery had been canceled. Indeed, Bourjaily does not deny in his briefing that he was aware of this significant turn of events. Instead, he labels the issue a "red herring," ECF No. 58 at 3 n.2, a characterization this court finds is at odds with Plaintiff's pleading and contrary to its mandate to view Plaintiff's allegations in the light most favorable to him. *See, e.g.*, *Hardy v. Rabie*, 147 F.4th 1156, 1163 (10th Cir. 2025) ("'In determining whether a dismissal is proper, we must accept the allegations of the complaint as true and construe those allegations, and any reasonable inferences that might be drawn from them, in the light most favorable to the plaintiff.'") (quoting *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002)). Bourjaily's attempt to minimize the cancellation overlooks Plaintiff's plausible contention that, as the primary provider responsible for coordinating care, Bourjaily would have been notified of such a critical event—particularly given the attendant risks of stroke, heart attack, or death highlighted by the surgeon and anesthesiologist, ECF No. 44 at 13-14, and the fact that Plaintiff was returned to the facility without the procedure. *See* ECF No. 69 at 4, 6, 12 (Plaintiff's response emphasizing Bourjaily's ongoing role and failure to act post-cancellation). Moreover, Bourjaily's reply does not rebut this inference with any factual denial, instead reiterating that the claim rests on mere disagreement with medical judgment, ECF No. 81 at 2-4, 7 (arguing the dispute reduces to a disagreement with medical judgment)—a position that fails to engage the well-pleaded facts alleging inaction in the face of known, escalating risks.

Applying these established complaint-construction principles here, the court concludes that Plaintiff's noteworthy return from transport for a scheduled surgery—sans surgery—distinguishes this situation from a case in which a provider failed to apprise himself, or simply overlooked, a data point contained in a medical chart. Neither do the facts here plausibly suggest a scenario in which an inmate merely prefers one course of treatment over another, *see* ECF No. 58 at 14, which indisputably does not rise to the level of a constitutional violation.

By contrast, Bourjaily knew that Plaintiff was scheduled for surgery; he had specifically discussed the upcoming procedure with Plaintiff just a few days before it was abruptly canceled because the specialists involved (and the hospital for which they worked) deemed the procedure too risky because of Plaintiff's occluded carotid arteries. Just twenty days later, the treating cardiologist to whom Bourjaily had referred Plaintiff in June 2022, stated in a written report that Plavix would not reduce the blockages and that Plaintiff should be referred to a vascular surgeon or specialist for further examination. With Bourjaily having set the cardiology referral process in motion, it is not plausible to conclude that he was not cognizant of the results of that referral, particularly information sent to the prison so close in time to Plaintiff's being hauled back from St. Thomas More with an unrepaired shoulder. Too, it is apparent from the well-pleaded facts that Bourjaily was in fact reviewing materials that were sent into the institutional outside medical providers: his review of the report from St. Thomas More following Plaintiff's second TIA on May 30, 2022, prompted Bourjaily to alter Plaintiff's medication regimen from aspirin to Plavix.

Nevertheless, Bourjaily took no action to address the risks associated with Plaintiff's occluded carotid arteries—a condition of sufficient import to derail a long-planned surgery—from the date of the canceled surgery through the remainder of his primary care watch ending in

December 2022. These facts indicate that Bourjaily's alleged conduct plausibly falls within several categories evincing deliberate indifference, including by "declin[ing] or unnecessarily delay[ing] referral" and "fail[ing] to treat a medical condition so obvious that even a layman would recognize the condition." *See Est. of Hurtado v. Smith*, 119 F.4th 1233, 1237 (10th Cir. 2024) (outlining "several circumstances that rise to the level of deliberate indifference") (citing *Self*, 439 F.3d at 1232). On the pleadings, Bourjaily was aware of the occlusions, and a reasonable layperson would recognize that significant bilateral carotid blockages, left untreated, pose life-threatening risks. At a minimum, in light of the information alleged to have been available to Bourjaily, the facts evince a situation in which he "refused to verify facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023) (quoting *Farmer*, 511 U.S. at 842, 843 n.8). This is sufficient, at the pleading stage, to plausibly allege the subjective component of a deliberate indifference claim. *See id.*

The court recognizes that a very different picture may be revealed on a full record. But at this stage of the case, Plaintiff's pleading suffices to allege the subjective element of a deliberate indifference claim. And in light of the fact that physicians urged treatment for, or repair of, the occluded arteries before Plaintiff could receive surgery to repair a painful shoulder injury—or, at the very least, advocated for an examination of Plaintiff's condition by a qualified vascular specialist—the law was clearly established that a provider may act with deliberate indifference by preventing access to, or declining referral to, medical personnel capable of addressing a serious condition in these circumstances. *See Est. of Hurtado*, 119 F.4th at 1237; *see also Sealock*, 218 F.3d at 1211 ("deliberate indifference occurs when prison officials prevent an

inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment") (citing *Ramos*, 639 F.2d at 575). Bourjaily therefore is not entitled to qualified immunity at this juncture.

### 3.    Claim Against Meyer

As discussed, the deliberate indifference claim against Defendant Meyer is premised solely on the allegation that she responded to a first-level grievance Plaintiff submitted in July 2022. ECF No. 44 at 12 (alleging only a Step-1 grievance response); *see also* ECF No. 58 at 10-11 (no allegations that Meyer was involved in Plaintiff's medical care). That is insufficient to satisfy the personal participation requirement for a § 1983 claim, entitling her to qualified immunity.

It has long been established "[t]he 'denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.'" *Stewart v. Beach*, 701 F.3d 1322, 1328 (10th Cir. 2012) (quoting *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009)); *see also, e.g.*, *Parker v. Allbaugh*, 844 F. App'x 75, 78 (10th Cir. 2021) ("It is well-settled in this circuit that the denial of a grievance does not adequately establish personal participation."). Because Plaintiff has failed to connect Meyer in any way to the alleged violation of his Eighth Amendment rights, he has similarly failed "to put [her] on notice of what [she] personally is alleged to have done to violate plaintiff's rights. [Meyer] is entitled to qualified immunity on plaintiff's deliberate indifference claim based on plaintiff's failure to allege any facts in support of [her] participation in the deprivation of plaintiff's constitutional rights." *See Vreeland*, 2023 WL 6160693, at *8. Indeed, Plaintiff effectively concedes the point. *See* ECF No. 69 at 5 (acknowledging that "Meyer had no

31

involvement in direct patient care" and that "dismissal [of the claim against her] may be appropriate").

In light of Meyer's entitlement to qualified immunity—and the inability of Plaintiff to rework his pleading to circumvent the fact that Meyer's only involvement with this litigation was denying a grievance—the claim against Meyer is **dismissed with prejudice**.

## II.    Rogers Motion

Rogers—who served as Plaintiff's primary care provider from May 1, 2020, through September 30, 2020—argues that the Eighth Amendment claim Plaintiff brings against her must be dismissed because he has failed to allege either the objective or subjective elements of actionable deliberate indifference and because the claim is time-barred. ECF No. 80 at 7-12.[14] The court finds that the claim against Rogers must be dismissed for substantially the same reasons that warrant dismissal of the claim against Ontiveras, and thus incorporates herein its legal analysis and conclusions that Plaintiff's allegations fail to satisfy the subjective component of deliberate indifference and that the claim is time-barred. To avoid redundancy, it suffices to underscore the key aspects of that analysis as applied to the specific—and notably sparse— allegations regarding Rogers' conduct.

As with the claim against Ontiveras, Plaintiff cannot hold Rogers liable on a theory that she possessed subjectively culpable intent by failing to implement directives or recommendations from the providers at St. Thomas More following his first TIA on May 1,

---

[14] The court is unpersuaded that Plaintiff's allegations concerning his occluded arteries—the effects of which were plausibly manifested in the symptoms that prompted Rogers to initiate a stroke protocol—fail to satisfy the objective component of deliberate indifference. *See* ECF No. 80 at 7-8.

2020. He has not plausibly alleged that any such recommendations or directives were in fact issued at that time, such that Rogers could have reviewed them, much less what requirements they purported to impose. Nor has Plaintiff alleged that Rogers actually reviewed the report from St. Thomas More providers or possessed actual knowledge of it. Notably, Plaintiff does not allege that he ever had a medical encounter with Rogers again after May 1, when she perceived that he might be having a stroke and initiated his transport to St. Thomas More, or that his alleged need for treatment was made known to her by other means. Likewise can no inference of Rogers' supposed knowing disregard of an "excessive risk" to Plaintiff's health, *Sealock*, 218 F.3d at 1209, be drawn from the fact that she failed to take steps to apprise herself of what some provider at St. Thomas More *might* have said about Plaintiff's occluded left carotid artery and recommendations for follow-up care—an omission that plainly falls in the realm of medical negligence rather than a constitutional violation. In short, the well-pleaded facts do not plausibly indicate that, between May 1, 2020, and September 29, 2020, Rogers was subjectively "aware of facts from which the inference could be drawn" that Plaintiff faced "a substantial risk of serious harm," and that she actually drew the inference. *See Farmer*, 511 U.S. at 837.

Finally, the well-pleaded facts leave no reason for doubt that the latest date on which Rogers might have been responsible for Plaintiff's care was September 29, 2020 (with Ontiveras assuming the role the following day), meaning that the claim against Rogers was filed long past the expiration of the two-year statute of limitations on September 29, 2022. As Rogers observes, Plaintiff was sent to the emergency department of the closest hospital to Fremont on May 1, 2020, for symptoms so concerning as to prompt Rogers to initiate a stroke protocol, and which resulted in his losing control of his body so that he sustained a physical injury to his shoulder that

required surgery to repair. These facts unquestionably apprised Plaintiff "of the general nature" of the injury that triggered this lawsuit; his "[l]ack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute" of limitations. *Gustavson v. United States*, 655 F.2d 1034, 1036 (10th Cir. 1981).

Plaintiff's claim against Rogers therefore must be **dismissed with prejudice**, both for failure to plead a plausible claim for relief and because it is time-barred.

## CONCLUSION

For the foregoing reasons, the court respectfully **ORDERS** as follows:

(1) The Rule 12(b)(6) Motion to Dismiss filed by the CDOC Defendants (ECF No. 58) is **GRANTED in part** and **DENIED in part**. All claims brought against Defendants Ontiveras and Meyer are **DISMISSED with prejudice**. The CDOC Motion is denied as to the claim brought against Defendant Bourjaily, which shall proceed to the extent it is premised on his alleged deliberate indifference following the cancellation of Plaintiff's surgery on September 1, 2022;

(2) Defendant Melissa Rogers' Motion to Dismiss Plaintiff's Amended Complaint [ECF 13] and Supplement to His Amended Complaint [ECF 44] Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 80) is **GRANTED**. All claims brought against Defendant Rogers are **DISMISSED with prejudice**; and

(3) The stay of discovery (ECF No. 93) is hereby **LIFTED**. The Fed. R. Civ. P. 16(b) Scheduling Conference shall be held on **November 17, 2025**, at **10:00 a.m.,** before Magistrate Judge Susan Prose. Parties wishing to attend in person may appear in Courtroom A-502, on the fifth floor of the Alfred A. Arraj United States Courthouse located at 901 19th Street, Denver, Colorado. Parties are permitted to attend telephonically by calling 571-353-2301, Guest meeting

ID- 868150043. Any telephonic attendees are requested to mute their phone when not speaking, as well as avoid speakerphone and Bluetooth connections. Counsel for Defendants Bourjaily and Barrack shall confer with Plaintiff and submit a proposed Scheduling Order on or before **November 10, 2025.**

DATED: September 30, 2025          BY THE COURT:

_____
Susan Prose
United States Magistrate Judge